Filed 4/23/13  In re Alexis S. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re ALEXIS S., a Person Coming Under the Juvenile Court Law. | B242941 (Los Angeles County Super. Ct. No. PJ48580) |
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ALEXIS S.,<br><br>  Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Fred J. Fujioka, Judge.  Affirmed.

Kimberly Howland Meyer, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Defendant and appellant Alexis S. appeals from the order of wardship (Welf. & Inst. Code, § 602) entered as a result of the juvenile court's findings he committed two counts of forcible rape of a person under the age of 14 years (Pen. Code, § 261, subd. (a)(2)) and one count of attempted forcible rape of a person under the age of 14 years (Pen. Code, §§ 664, 261, subd. (a)(2)), and his admission that he had brought a folding knife with a locking blade onto school grounds (Pen. Code, § 626.10, subd. (a)(1)). The juvenile court ordered Alexis removed from his home and placed in an open facility on the conditions, among others, that he undergo counseling and a 52-week sexual offender program. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*.

Thirteen-year-old Stephanie J. and 13-year-old Alexis attended the same middle school. In November and December of the previous year, 2011, Stephanie and Alexis had been boyfriend and girlfriend. After the two dated for approximately two weeks, they broke up and did not speak to each other until the winter break, which began sometime during the last two weeks of December. At that time, Alexis began to send to Stephanie text messages.

At first Stephanie ignored the messages, but when Alexis continued to send them she started to respond, believing that if she did so he would stop bothering her. At first, Alexis sent messages asking Stephanie things like " 'What's up?' " and " 'How are you doing[?]' " However, the following week, Alexis sent Stephanie a message telling her to "send him a picture of [her] private parts." When Stephanie told him " 'No,' " Alexis sent her a text message indicating that if she did not do it, he would "put on facebook, on [her mother's] wall and [her] wall, that he had [had] sex with [her]." Because she was afraid that he would put "what he said on facebook and [that] everybody [would] start calling [her] a slut[,]" Stephanie used her cell phone to send to Alexis a photograph of her naked breasts. Stephanie then told Alexis to leave her alone and, for one or two weeks, he stopped communicating with her.

2

After a couple of weeks, Stephanie received another message from Alexis. He indicated that he wanted another picture and, when Stephanie told him that she would not send it, he again told her that he would "put it on facebook." Stephanie sent to Alexis a photograph of her "bare vagina" and told him to "leave [her] alone." Although Stephanie had not wanted to send Alexis the photograph, she did so because she was afraid that if she did not, he would put the photograph of her breasts on facebook.

After she sent him the picture of her vagina, Alexis did not communicate with Stephanie for the remainder of the winter break, which ended during the second week of January. However when classes started, Alexis again began to send Stephanie text messages. "He said he wanted to talk" and when Stephanie told him, " 'No[,]' " Alexis sent her another text message the following day. Stephanie decided to speak to Alexis, hoping that if she did he would "stop bothering [her]."

Stephanie met Alexis on the physical education field during lunchtime and the two talked. Alexis told Stephanie that he was sorry for what he had done. Stephanie told him " 'Okay[,]' " and the two did not talk again until February. At that time, Alexis indicated that he "wanted to meet up again." At first, Stephanie told Alexis that she did not want to. But when he told her that he still had the photographs that she had sent to him and that he would put them on facebook, she agreed to meet with him after school in the parking lot behind the janitor's area. There was a shed there with no windows and Alexis opened the door and told Stephanie to go inside. Because Alexis had told Stephanie that he just wanted to talk, she went inside and sat down at a table.

Alexis told Stephanie to get up. However, at that moment she was looking for her phone in her bag and she remained seated. He again told her to get up, then grabbed her and pushed her up against the wall. Although Stephanie fought back, Alexis, who was taller than Stephanie, attempted to take her clothes off. As he held her up with her back against the wall, Alexis unzipped her pants, removed them and her underwear, then lowered his shorts and placed his penis inside her vagina. Stephanie told Alexis to stop and started to scream, but Alexis told her to "shut up" and placed his penis in her vagina "at least three or four times." Alexis stopped when his phone rang. After he read the text

3

message, he left the shed, closing the door behind him. The entire incident lasted for approximately 10 minutes.

Stephanie, who was crying, stayed in the shed for at least 10 minutes while she put her clothes back on and attempted to compose herself. Stephanie did not tell anyone what had happened in the shed because she did not want anyone to know. Before he left the shed, Alexis had told Stephanie that, if she told anyone, he would place the photographs she had sent him, as well as indicate that he had had sex with her, on facebook.

After the incident in the shed, Alexis did not send Stephanie any messages for approximately one month. He then sent her a message which stated, " 'After school let's meet up at the same spot like we did last time.' " When Stephanie sent him a message indicating she would not do it, he again threatened to put her photographs and to indicate that she had had sex with him on facebook. Stephanie decided to go to the shed. However, when she met Alexis there, the shed was closed. Alexis spotted a desk behind the building where the janitors kept their supplies and he escorted Stephanie to the desk and had her sit down. There, he attempted to remove her shirt. After Stephanie twice told him to stop, Alexis did so and, instead, unzipped her shorts. Although Stephanie told Alexis that she did not " 'want to do this,' " to " 'stop' " and to " 'leave [her] alone,' " Alexis unzipped his shorts, took out his penis and put it in Stephanie's vagina. Stephanie was screaming as Alexis took his penis out, then put it in Stephanie's vagina approximately three times. Alexis then told Stephanie "to give him head." Stephanie did not understand what Alexis meant so he told her that he wanted her to give him "a blow job." Stephanie told Alexis that she "wasn't going to do it." However, after Alexis again threatened to place her photographs on facebook, Stephanie "put [her] mouth on [Alexis's] penis." After a time, Alexis pulled his penis out and masturbated. Believing that "he was done with [her]," Stephanie pulled up her shorts and got ready to leave. As she was walking away, Alexis called out Stephanie's name. She turned around and he told her to look at his hand which was filled with semen. When Stephanie asked Alexis

4

why he was showing her that, he did not answer.  He took a piece of paper from the floor and wiped off his hands.

Before she went to meet Alexis, Stephanie had arranged for a friend to wait for her at some benches.  Stephanie had told her friend that, if he heard her scream, he was to come over and get her.  Stephanie's friend apparently heard her scream, but by the time he arrived at the desk, Stephanie had pulled up her shorts.  When Stephanie's friend walked up, Alexis left the area.

Stephanie and her friend then went to a nearby 7-Eleven store.  Stephanie's friend wanted to confront Alexis about the incidents, but Stephanie told him not to.  Stephanie was afraid that if Alexis knew that she had told her friend what was happening, Alexis would "put [her] pictures on facebook."

Stephanie did not hear from Alexis again until March.  Then, one day during their sixth period, she received a message from him telling her to go to the bathroom.  Stephanie refused and Alexis sent her a second message which said, " 'Can I grab your ass?' "  Stephanie sent Alexis a message telling him " 'No.' "  He then sent her another message regarding his girlfriend.

A short time later, Alexis sent to Stephanie a message asking her why she would not meet with him.  She responded that he had a girlfriend.  He was dating her best friend.  Alexis then sent a message indicating that he "didn't have a girlfriend at the time" and that if Stephanie did not meet him he would "show [her] friends [and] his friends [and] mostly everybody [that he knew] from the school, the picture[.]"  Alexis also threatened to post the picture on Stephanie's mother's wall on facebook.  Stephanie responded by telling Alexis, " 'You know what?  Fine.  I'd rather you show them[.]' "  However, a short time later, Stephanie changed her mind and told Alexis , " 'Okay.  I'll meet you in the back[.]' "  She added, however, that her mother no longer used facebook and that she, Stephanie, had her period.  Alexis replied, " 'Fine.  Through your ass then.  So go over there.' "  Alexis continued, stating, " 'I'm going to bring a condom and wash my dick.  Good for you, and you too, and you're going to wash your clit too; right?' "

Before going to the shed for the third time, Stephanie asked her friend to wait for her nearby and, if he heard her screaming, to come get her. When Stephanie arrived at the shed, Alexis attempted to take off her clothes but she "tried to move his hands around so he [could not] touch [her]." At some point he was able to unzip her shorts, so Stephanie started screaming. Her friend came over as Alexis was attempting to remove Stephanie's shorts. When Stephanie's friend arrived, Alexis left the area.

During the second semester, Stephanie saw Alexis with his cell phone, showing something to his friends and saying, " 'Look what [Stephanie] sent me.' " Although Stephanie did not know what Alexis was showing them, after he had done so, his friends made comments to her such as, " 'Damn, what a slut.' "

At some point after the third incident, Stephanie did not go to school for approximately one month. She then transferred to another middle school.

Stephanie had never had sex until the incidents with Alexis. All she knew was what she had learned in sex education class, that "a guy's penis goes in a girl's vagina, and the sperm cells go inside the girl's eggs . . . ." In addition, Stephanie has a learning disability. She indicated that she did not "understand a lot of things. [She] could visualize things by drawing a picture . . . ." However, when someone asks her a question, she does not always understand it; she gets confused. When Stephanie was asked why when, "after the first incident, when he had sex with [her] in the shed," she then went "back to meet [Alexis]" the second and third times, Stephanie responded that she had gone back because, by this time, Alexis was not only bothering her, he was "punking" her younger brother. She thought that if she went there and "just [got] it over with," he would leave her and her brother alone.

On March 9, 2012, Los Angeles Police Officer Manuel Delgado was assigned to the West Valley Juvenile Division. During the afternoon hours of that day, Delgado interviewed Alexis at the station in the holding tank for juveniles. Alexis told the officer that he went to school and that he knew the difference between right and wrong. When the officer asked him for an example of something "right to do," Alexis indicated that it was right not to steal. When the officer asked him for an example of something wrong to

6

do, Alexis responded that it would be wrong to hit a teacher. When the officer inquired, Alexis indicated that, when one does something wrong, there are consequences.

Delgado asked Alexis if it was wrong "to force a girl to have sex" and Alexis indicated that it was. Delgado then asked Alexis if it was wrong to "help someone else to force a girl to have sex" and Alexis said that it was. When the officer asked Alexis whether, if someone else forced him to have sex that would be wrong, Alexis responded, " 'Yes.' " However, when the officer asked Alexis "if he was ever taught it was wrong," he responded " 'No.' " The officer then asked Alexis if he knew it was wrong to rape and, according to the officer, "he may have said, 'Yes.' "

Katherine Gosser is a detective for the West Valley Division of the Los Angeles Police Department. She is "assigned to sexual assault investigations." She has worked in that division for approximately four years. Prior to that, she had worked "child abuse investigating homicides all the way down to sexual assaults and batteries with child victims." On March 9, 2012, she was assigned to Alexis's case.

After he was advised of his *Miranda*[1] rights, Alexis indicated that he understood them, then agreed to speak with the detective. He told her that he knew Stephanie; he had been introduced to her by a mutual friend. Alexis told the detective that he and Stephanie dated for a couple of weeks. After they broke up, Alexis and Stephanie were friends for a time. Then, in January 2012, he started "to ask her for dirty photographs." Alexis told the detective that Stephanie did not want to send him the photographs, but he threatened to "tell people on facebook that they were having sex." Alexis pressured Stephanie to send "explicit nude photographs" and, after first sending him one of her in her panties and bra, she finally sent him one of her naked breasts. Alexis indicated that, after she sent the photograph, "things were fine for awhile, and then he started to pressure her again to send additional photographs." After approximately two weeks, "she sent a photograph of her vaginal area."

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

It was still January 2012 when Alexis asked Stephanie to meet him at the shed. Although they started kissing, Alexis confessed that Stephanie did not want "to have contact with him. He admitted that she tried to leave the shed and [fought] with him to get out . . . ." Instead of allowing her to leave, Alexis pulled off Stephanie's clothing and sodomized her. During the incident, Stephanie had made it clear that she did not want to participate and she repeatedly told Alexis, " 'No.' "

Alexis, who had his head down and was subdued throughout the interview, told the detective that the second incident occurred a couple of weeks later. He again told Stephanie that he was going to post her pictures on facebook and tell her mother that he and Stephanie were having sexual intercourse. She met him again, this time on the side of the shed. Although "she didn't want to," Alexis removed Stephanie's clothing and "had vaginal intercourse with her." Alexis indicated that the third incident occurred on March 8, 2012. He and Stephanie again met by the shed and this time he "asked her to perform oral copulation on him." Alexis "said that [Stephanie] gave him a blow job, and also during that incident, that he tried to pull off her shirt but that one of her friends . . . intervened when she started yelling . . . ."

When Detective Gosser asked Alexis if he knew that what he had done was wrong, "he said he knew it was wrong." When the detective asked Alexis if Stephanie wanted to have sex with him, he said that she did not. He knew this because, although initially she had said " 'Yes,' " throughout the remainder of the incidents, she repeatedly told him, " 'No.' " In addition, during the first incident she had "tried to escape from the shed." When Detective Gosser asked him "why . . . he then [did] that to her," Alexis responded that he "just wanted to have sex."

The detective asked Alexis if he still had the photographs Stephanie had sent him and he indicated that he had deleted them. He "did not tell [the detective that] he [had] posted them."

Detective Gosser also interviewed Stephanie. She cried the entire time. During the interview, Stephanie told Gosser that "she sent [Alexis] the dirty pictures . . . because she could tell, while they were on facebook and chatting, that he was about to post

8

something about her[.]" Stephanie also told the detective that she had told several friends about what had happened between her and Alexis. Gosser indicated that Stephanie "explained that initially she didn't say anything to anyone and that, when she finally said something, it was to [the friend she had asked to come with her to the second and third incidents], and that was because, after the first incident, she was so distraught" that he "kept asking her what was wrong." She told two other friends in February. They tried "to help her block [Alexis's] number" from her cellular telephone.

Although Detective Gosser had not met Stephanie before she interviewed her on March 9, 2012, Gosser had interviewed hundreds, if not thousands of adolescent victims and the way Stephanie "acted during the interview[] was . . . similar to how . . . other victims [had] acted." Although she said she had "not want[ed] to," Stephanie reported the incidents which had occurred with Alexis to the police on March 9, 2012.

2. *Procedural history.*

In a petition filed on November 15, 2011 pursuant to section 602 of the Welfare and Institutions Code, Alexis was charged with violating Penal Code section 626.10, subdivision (a)(1). It was alleged that, on September 14, 2011, he committed the felony of bringing a weapon, a folding knife with a locking blade, onto school grounds. Alexis was released to the custody of his mother and proceedings in the matter were continued.

On March 13, 2012, a second petition was filed pursuant to Welfare and Institutions Code section 602. In counts 1 and 2, it was alleged that, on or between January 1, 2012 and February 12, 2012, Alexis twice committed the crime of forcible rape of a victim under 14 years of age in violation of Penal Code section 261, subdivision (a)(2), a felony. In count 3, it was alleged that, between January 1, 2012 and February 29, 2012, Alexis committed the crime of forcible oral copulation on a victim under 14 years of age in violation of Penal Code section 288a, subdivision (c)(2)(B), a felony. Finally, in count 4 it was alleged that, on or about March 8, 2012, Alexis committed the crime of attempted forcible rape of a victim under 14 years of age in violation of Penal Code sections 664 and 261, subdivision (a)(2), a felony.

9

A hearing with regard to the second petition was held on July 3, 5 and 6, 2012. After the prosecution presented its evidence, defense counsel made a motion to dismiss the matter pursuant to Welfare and Institutions Code section 701.1 based on the assertion that there was insufficient evidence to support any of the counts alleged in the petition. Counsel argued that she did not believe there was "enough [evidence] to show that [there was] a very clear statement of 'No.' " Counsel continued, "It sounds to me like there was a very vague . . . no, I don't really want to, but, sure, I'll still meet with you . . . ." Alexis's counsel indicated that she did not think that Stephanie "made it very clear that she did not want to have sex. [Counsel did not] think that there was any duress within the legal meaning or any menace within the legal meaning . . . ."

The trial court denied the motion as to counts 1, 2, and 4, indicating that the "victim was very clear [in] her testimony that she said 'No.' " In addition, although Alexis's use of force was "minimal," it was sufficient to sustain those counts. However, with regard to count 3, the juvenile court indicated that it had a problem with the allegation that it was forcible. The court stated: "I know that the victim was very clear that, when asked by the People what [Alexis was] doing with his hands, she said 'Nothing.' I don't believe it was a forcible oral copulation." Although the prosecutor argued that, although Alexis may not have used physical force, Stephanie was acting under duress and was clearly afraid of Alexis, the court concluded that "the amount of duress [Stephanie] was under was not sufficient to meet the standard of proof [with regard to] count 3." Accordingly, the juvenile court dismissed that count.

After hearing argument by the parties, the juvenile court indicated that it had found the victim in this matter to be "extremely credible." The court found "her dead affect [to be] completely consistent with the affect of a victim of a rape." The court stated that, "[i]n fact, it added to her credibility, the fact she didn't try to exaggerate her impact or emotion[s]. She didn't try to cry. She just looked—she testified with a dead affect, which I would [often] expect . . . from victims of rape." In addition, the juvenile court stated that Stephanie's "learning disability actually came out during the course of testimony where, in order to articulate what occurred, she had to write it down on a piece

10

of paper and draw a diagram." The court continued, "Having said that though, when she was asked questions about how she felt about defense counsel, she was pretty candid about it. 'I don't like you because you're his lawyer.' I believe that she was credible."

The juvenile court then indicated that it did not believe that "the basis for counts 1, 2, and 4 [was] duress or menace" because it did not "think the kind of threats that [Alexis] used against [Stephanie were] sufficient . . . . [¶] What [the court] believe[d] occurred [was that Alexis] used sufficient force in order to make it a rape." The court stated, " He's taller than [she is and,] [a]s the victim indicated, at times he would hold her around her waist, and his hands were going everywhere[.]" He pulled down her pants "and then entered into her. That was the use of force. It was in order to overcome her will, and it constituted rape." The juvenile court found that counts 1 and 2 had been "sustained by testimony" and it found them "to be true." With regard to count 4, the attempted rape, the juvenile court indicated that the way it was "described by the victim where [Alexis] was moving his hands all over her[,] . . . an attempted rape occurred."

At the dispositional hearing, the juvenile court first addressed the petition which alleged that Alexis had brought a folding knife with a locking blade onto school grounds. After Alexis admitted he knew it was wrong to take a knife to school, he indicated that he understood and was waiving his right to an adjudication or court trial with regard to the offense, his right to confront and cross-examine the witnesses against him, his right to present a defense, including the use of the court's subpoena power to order witnesses to come to court to testify on his behalf, his right to testify and his right to remain silent. Alexis then admitted having brought a folding knife with a locking blade onto school grounds, a felony in violation of Penal Code section 626.10, subdivision (a)(1). The juvenile court sustained the petition, finding, with the concurrence of counsel, that Alexis's admission had been "freely and voluntarily made" and that there was a "factual basis" for it.

With regard to the disposition of the petition under which the juvenile court found true the allegations of the rape and attempted rape of Stephanie, the juvenile court indicated that it was its inclination "to follow the recommendation of the probation

11

officer." The court continued: "It's my view that the minor has . . . severe problems in regards to his acting out, and in placement currently [in] place . . . they may be able to deal with it appropriately. I would have to say that [Alexis] should understand, and given the fact that he has been adjudicated and found guilty of three extremely serious charges, and ha[d] admitted to a further charge involving [a] weapon[], that [if] he doesn't make it in suitable placement, I would expect the People to file a [Welfare and Institutions Code section] 777 petition and it's highly likely he would go to camp. [¶] However, having said that, it's my first [inclination] to try suitable placement [where] he would be able to get the kind of counseling that perhaps may make him less of a threat to others . . . ."

After Alexis publicly apologized to Stephanie for making her "do those things," his counsel indicated that she agreed with the court that suitable placement was appropriate. The prosecutor, on the other hand, asserted that, "[a]s far as the People [were] concerned, if [Alexis] runs from suitable placement, if he doesn't do his program, camp [would not be] appropriate. The only place [which] would be appropriate at that point [was] the Department of Juvenile Justice because they're the only place that has an intensive program." Counsel continued: "Normally when I talk to people about sex offenders, usually I can say they wouldn't reoffend . . . . [But] [t]his young man, he would be . . . the [one in] five out of a hundred that I would say is a potential adult offender because of what he did and how he did it . . . . [¶] I don't think he's at all appropriate for suitable placement nor do I think camp is going to do anything. I truly think the Department of Juvenile Justice is the only place for him."

The juvenile court indicated that it would give Alexis "his one chance shot." The court then ordered Alexis suitably placed in an open facility under certain terms and conditions, including, among others, that he "[c]ooperate in a plan for psychiatric, psychological testing and treatment" and "participate [in] and complete [a] 52-week sexual offender program." The juvenile court stated that the maximum term of confinement for Alexis's offenses was 20 years 8 months. It had considered, "based on the facts and circumstances of the case," a confinement period for less than that imposed for adults convicted of the same offenses and, in the "exercise of [its] discretion," had

decided against a shorter period. The juvenile court then awarded Alexis 120 days of predisposition credit.

Alexis filed a timely notice of appeal from the juvenile court's order on July 20, 2012.

## CONTENTIONS

After examination of the record, counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record.

By notice filed December 17, 2012, the clerk of this court advised Alexis to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider. No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

## DISPOSITION

The order of wardship is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.

We concur:

KLEIN, P. J.



CROSKEY, J.


13